UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

No. 5:08-CV-527-D

| | |
|---|---|
| MICHAEL KING, ) | |
| ) | |
| Plaintiff ) | |
| ) | |
| v. ) | **MEMORANDUM AND** |
| ) | **RECOMMENDATION** |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

This matter is before the Court on the parties' cross motions for Judgment on the Pleadings **[DE's 15 & 17]**. The time for the parties to file any responses or replies has expired. Accordingly, these motions are now ripe for disposition. The underlying action seeks judicial review of the final decision by the Defendant denying Plaintiff's application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). Pursuant to 28 U.S.C. § 636(b)(1), this matter is before the undersigned for a memorandum and recommendation. For the reasons set forth herein, the undersigned RECOMMENDS that Plaintiff's Motion for Judgment on the Pleadings **[DE-15]** be DENIED and the Defendant's Cross-Motion for Judgment on the Pleadings **[DE-17]** GRANTED.

**Statement of the Case**

Plaintiff applied for DIB and SSI on January 10, 2005, alleging that he became unable to work on December 28, 2004, due to diabetes, and diabetes related foot and leg problems.

[Tr. 94-100, 121-22]. These applications were denied at the initial and reconsideration levels of review. [Tr. 79-81, 84-88, 508-511]. A hearing was held before an Administrative Law Judge ("ALJ") on April 7, 2008. [Tr. 526-63]. The ALJ concluded that Plaintiff was not disabled during the relevant time period in a decision dated April 24, 2008. [Tr. 10-19]. On September 26, 2008, the Social Security Administration's Office of Hearings and Appeals denied Plaintiff's request for review, thus rendering the ALJ's decision the final decision of the Defendant. [Tr. 3-5]. Plaintiff filed the instant action on November 3, 2008. **[DE-4]**.

## **Standard of Review**

This Court is authorized to review the Defendant's denial of benefits under 42 U.S.C. § 405(g), which provides in pertinent part:

> The court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing. The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . .

Id.

"Under the Social Security Act, [the Court] must uphold the factual findings of the Secretary if they are supported by substantial evidence and were reached through application of the correct legal standard." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996). "Substantial evidence is . . . such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971). "It consists of more

2

Case 5:08-cv-00527-D   Document 23   Filed 05/28/09   Page 2 of 18

than a mere scintilla of evidence but may be somewhat less than a preponderance." Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir.1966). "In reviewing for substantial evidence, [the court should not] undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the Secretary." Craig, 76 F.3d at 589. Thus, this Court's review is limited to determining whether the Defendant's finding that Plaintiff was not disabled is "supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir.1990).

## **Analysis**

The Social Security Administration has promulgated the following regulations which establish a sequential evaluation process which must be followed to determine whether a claimant is entitled to disability benefits:

> The five step analysis begins with the question of whether the claimant engaged in substantial gainful employment. 20 C.F.R. § 404.1520(b). If not, the analysis continues to determine whether, based upon the medical evidence, the claimant has a severe impairment. 20 C.F.R. § 404.1520(c). If the claimed impairment is sufficiently severe, the third step considers whether the claimant has an impairment that equals or exceeds in severity one or more of the impairments listed in Appendix I of the regulations. 20 C.F.R. § 404.1520(d); 20 C.F.R. Part 404, subpart P, App. I. If so the claimant is disabled. If not, the next inquiry considers if the impairment prevents the claimant from returning to past work. 20 C.F.R. § 404.1520(e); 20 C.F.R. § 404.1545(a). If the answer is in the affirmative, the final consideration looks to whether the impairment precludes the claimant from performing other work. 20 C.F.R. § 404.1520(f).

Mastro v. Apfel, 270 F.3d 171, 177 (4th Cir. 2001).

In the instant action, the ALJ employed the five-step evaluation. First, the ALJ found that Plaintiff is no longer engaged in substantial gainful employment. [Tr. 12][1]. At step two, the ALJ determined that Plaintiff suffered from the following severe impairments: 1) diabetes mellitus; 2) hypertension; and 3) peripheral neuropathy. [Tr. 12]. In completing step three, however, the ALJ concluded that Plaintiff does not have an impairment or combination of impairments that meet or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. [Tr. 13]. Specifically, the ALJ noted that Plaintiff's diabetes mellitus, hypertension, and peripheral neuropathy has not manifested in any other clinical findings indicating a level of severity compared to the criteria of those Listings, and therefore, his conditions cannot be found medically equal to the Listings. [Tr. 13].

In addition, the ALJ concluded that Plaintiff's diabetes mellitus does not meet or equal the criteria of section 9.08 of the Listings because it has not resulted in neuropathy demonstrated by significant and persistent disorganization of motor function in two extremities resulting in sustained disturbance of gross and dexterous movements of gait and station; or acidosis occurring at least once every two months documented by blood chemical tests; or retinitis proliferans. [Tr. 13].

Before the ALJ proceeded to step four of his analysis, he determined that Plaintiff has

---

[1] However, in his decision, the ALJ did note that based on the evidence of record, Plaintiff earned $5,072.50 in 2005 and $7,229.97 in 2006. Notwithstanding these earnings, the ALJ concluded "[t]hese amounts do not meet the threshold consideration as substantial gainful activity." [Tr. 12].

4

the residual functional capacity to ("RFC") to perform light work, which would involve: 1) lifting and carrying twenty pounds occasionally and ten pounds frequently; 2) standing and walking six hours of an eight-hour workday; 3) sitting six hours in an eight-hour work day with alternating between sitting and standing every sixty minutes; and 4) occasional climbing of stairs, crouching, balancing, stooping, bending, kneeling, and crawling. [Tr. 13]. However, Plaintiff cannot climb ladders or use firearms and must avoid working around unprotected heights, dangerous machinery, and extreme cold. [Tr. 13]. In addition, Plaintiff will also need to elevate his feet above his knee/waist for one hour during an eight-hour workday and may experience mild to moderate pain that is amenable to control with medications without side effects. [Tr. 13]. Furthermore, Plaintiff must also be limited to tasks that involve limited interaction with the public, simple instructions, and simple, routine, repetitive tasks. [Tr. 13].

The ALJ then proceeded with step four of his analysis and concluded that Plaintiff could not return to his past relevant work. A Vocational Expert ("VE") testified at the hearing that despite Plaintiff's limitations, he is capable of making a vocational adjustment to other work that exists in the national economy. [Tr. 18]. Thus, after taking all of these factors into account, at step five of his analysis, the ALJ determined that Plaintiff was not disabled. [Tr. 18-19]. In making his determination, the ALJ cited substantial evidence, a summary of which now follows.

On April 1, 2000, Plaintiff was involved in a car accident. [Tr. 14, 310]. After the accident, he was examined in the emergency room with complaints of left elbow and back pain. [Tr. 14, 310]. The examination of his upper left extremity revealed mild tenderness over the proximal ulnar and some mild swelling. [Tr. 14, 310-311]. However, Plaintiff had good movement of his elbow and wrist, good motor sensory and vascular status, and could move his extremities well. [Tr. 14, 311]. In addition, the lumbar radiographs that were taken were negative for acute bony deformity and Plaintiff was given Ibuprofen for his discomfort. [Tr. 311]. On discharge, Plaintiff was assessed with lumbar strain and left elbow contusion. [Tr. 14, 311].

Several years later, on January 31, 2004, Plaintiff was involved in another car accident. [Tr. 14, 318-21]. In the emergency room, he reported pain in his leg, arm, head, feet, back, neck, and mouth. [Tr. 14, 318]. On examination he showed some tenderness around L1-L2; tenderness from L1 down to L5 on the left side; no obvious swelling; no central bony functional deficits and he walked with a normal gait. [Tr. 14, 318-19]. On discharge, he was in stable condition, given a prescription for Penicillin and Lortab, and instructed to follow-up with his primary care physician. [Tr. 14, 319].

On December 25, 2004, Plaintiff visited the emergency room again with complaints of right leg pain. [Tr. 14, 425]. The examining physician noted that Plaintiff is an insulin-dependent diabetic and that his blood sugar was 336 at the time of the visit. [Tr. 14, 425,

6

426]. The doctor gave him six units of IV insulin for his elevated glucose. [Tr. 14, 426]. He also treated him with Neurontin for his neuropathic pain. [Tr. 426]. On discharge, the doctor assessed that Plaintiff had peripheral neuropathy, neuropathic pain, poorly controlled diabetes, and epididymitis. [Tr. 14, 426].

Plaintiff returned to the emergency room on December 30, 2004. [Tr. 14, 423]. During this visit, Plaintiff complained of right thigh and right leg pain that had been present for about a month. [Tr. 423]. Plaintiff's blood sugar was 148. [Tr. 424]. The examining physician gave him ten milligrams of Morphine and twenty-five milligrams of Phenegran. [Tr. 424]. The doctor assessed that he had peripheral neuropathy, restarted him on the Neurontin, and instructed him to follow-up with his primary care physician. [Tr. 14, 424].

On January 3, 2005, Plaintiff visited Dr. Elie Osta with complaints of severe pain. [Tr. 14, 368-70]. The doctor's physical examination revealed that Plaintiff had moderate pain and tenderness in the right hip. [Tr. 14, 368-69]. However, the doctor also noted that Plaintiff did not have any other problems in his extremities, and that the status of the examination was normal. [Tr. 14, 369]. The doctor prescribed Percocet for treatment of Plaintiff's right leg pain. [Tr. 14, 369].

A few weeks later, on January 12, 2005, an MR was performed on Plaintiff's right foot and right thigh. [Tr. 14, 326]. Examination of the foot did not reveal any osseous, articular, or soft tissue abnormality. [Tr. 14, 336]. Likewise, examination of the thigh did

7

not reveal any definite cortical disruption, the muscular structures throughout the thigh showed normal signal and appearance, there was no soft tissue mass, and the subcutaneous fat showed a normal homogeneous signal. [Tr. 14, 336]. The impression for both examinations was negative. [Tr. 14, 336].

Plaintiff was examined by a state-agency medical consultant, Dr. Mendi Goodwin, on April 9, 2005. [Tr. 14, 415-22]. Dr. Goodwin completed a Physical Residual Functional Capacity Assessment form and concluded that Plaintiff retained the ability to: 1) lift and/or carry fifty pounds occasionally and twenty-five pounds frequently; and 2) sit, stand, and/or walk for about six hours in an eight-hour workday with limited pushing and/or pulling. [Tr. 14, 416]. On November 2, 2005, Dr. Joe Dascal affirmed Dr. Goodwin's RFC assessment with limited climbing and the need to avoid hazards and heights. [Tr. 14, 402]. On May 11, 2005, Plaintiff visited the Wayne Family Medical Center for a follow-up for his diabetes and neuropathy. [Tr. 14, 340]. The treatment notes indicate that Plaintiff had been non-compliant with the prescribed treatment. [Tr. 14, 340].

Several years later, on February 22, 2007, Plaintiff reported to the WATCH Mobile Medical Unit with complaints of dizziness, thirstiness, and sleepiness. [Tr. 14, 274]. The nurse practitioner that examined Plaintiff, Sue Barnett, noted that Plaintiff reported that he had been out of insulin for two weeks, out of blood pressure medication for several months, and had a history of non-compliance with treatment in the past. [Tr. 14, 274]. She instructed

Plaintiff to visit the emergency room because he had elevated glucose levels. [Tr. 274, 283].

At the emergency room, Plaintiff was examined by Dr. Hervy B. Kornegay. [Tr. 15, 283]. The doctor noted that Plaintiff had been out of his insulin medication for two months and out of his blood pressure medication since the past fall. [Tr. 283]. During the visit, Plaintiff complained of intermittent blurred vision, however, on examination, he denied blurred vision, shortness of breath, or chest pain. [Tr. 15, 283]. He also had symmetrical strength in his upper and lower extremities. [Tr. 15, 283]. After he received treatment for his high glucose levels, Dr. Kornegay advised Plaintiff about the importance of being compliant with his medications and discussed the risks associated with diabetes and hypertension. [Tr. 15, 284]. The doctor assessed Plaintiff with uncontrolled diabetes, hypertension, and noncompliance. [Tr. 284]. He also referred him to an educational diabetes course called: Essentials of Self Care, Diabetes Self-Management Program. [Tr. 270, 284]. Several months later, on November 24, 2007, Plaintiff visited the emergency room again with symptoms related to his diabetes and hypertension. [Tr. 15, 245]. The examining physician noted that he had been out of his medications for several days and has a history of noncompliance diabetic management. [Tr. 15, 231]. Plaintiff complained of what he thought was pink eye in his right eye, headaches, nausea, and vomiting. [Tr. 231]. The doctor's examination revealed rubeotic glaucoma in the right eye, altered mental status, and diabetic complications. [Tr. 15, 231-32]. The doctor treated his hypertension and headaches with

Case 5:08-cv-00527-D   Document 23   Filed 05/28/09   Page 9 of 18

Morphine and Vasotec, his nausea with Phenergan, and gave him intraocular injections for his eye. [Tr. 15, 231]. He assessed that Plaintiff had a hypertensive crisis, hypertensive encephalopathy, acute glaucoma of the right eye, insulin dependent diabetes, noncompliance, and headache that was most likely related to both his hypertension and glaucoma. [Tr. 14, 231].

Just a week later, on December 1, 2007, Plaintiff reported to the emergency room again with complaints of eye vision pain and redness in his right eye. [Tr. 15, 222]. His treatment notes indicate that he had run out of his blood pressure medication, and had not been taking it, and also that he had undergone a laser procedure on his right eye four days prior to his visit to the emergency room. [Tr. 15, 222]. The examining physician referred him to an ophthalmologist for further evaluation. [Tr. 15, 223].

On December 28, 2007, Plaintiff visited Rosemary Kelly, PA-C, to establish care. [Tr. 15, 210-11]. During the visit, Plaintiff admitted that he had not followed through with his blood pressure and diabetes treatments for years. [Tr. 15, 210]. However, he also indicated that he was ready to stay with the program because he did not want to return to the hospital or lose function of his kidneys or other organs. [Tr. 210]. With regard to his medications, Plaintiff related that he did not have money to pay for the medications because he has been out of work since he was released from the hospital. [Tr. 210]. However, he also admitted that he currently had a good supply of some medications. [Tr. 15, 210]. Plaintiff reported

numbness and tingling in his hands and feet, but denied lightheadedness, dizziness, chest pain, shortness of breath, palpitations, and GI symptoms. [Tr. 15, 210]. His examination did not reveal any edema in his extremities and his feet did not have any lesions. [Tr. 15, 211]. In addition, he was alert and oriented, his speech was clear, he had good eye contact, and his gait was steady. [Tr. 15, 211]. He also did not have any focal deficits and 5/5 strength bilaterally. [Tr. 15, 211]. After completing her examination, Ms. Kelly assessed that Plaintiff had: 1) type 2 diabetes with a long history of poor control; 2) hypertension with poor control off medication; 3) glaucoma with recent surgery performed by Duke Medical; and 4) was overdue for preventative medicine. [Tr. 211].

On January 29, 2008, Dr. Jeff Margolis completed a Report of Medical Examination Form regarding Plaintiff's functional limitations for work activity. [Tr. 15, 215]. Dr. Margolis opined that Plaintiff had the expected work capacity for part-time work, in a climate controlled environment, with a gradual increase to full-time work. [Tr. 15, 215]. In his decision, the ALJ included Dr. Margolis' opinion with the other evidence of record, but concluded that the doctor's "finding is not accepted as it is not supported by the record as a whole." [Tr. 15, 17].

A few days later, on January 31, 2008, Plaintiff was examined by Dr. Mohammed ElMallah for a post-operative visit. [Tr. 15, 186]. Dr. ElMallah indicated that Plaintiff was released to return to work, and that his only restriction was no lifting greater than forty

pounds. [Tr. 15, 186]. In his decision, the ALJ gave "substantial weight to Dr. ElMallah's conclusion[s] . . . ." [Tr. 17].

With regards to all the evidence of record, the ALJ made the following findings:

> After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the residual functional capacity assessment for the reasons explained below.
> At the hearing, the claimant testified that he has pain in his legs, but is able to walk a long way if he does not have neuropathy. He stated that he tried to do yard work in 2006, but people did not want him to work because of his condition. The claimant added that pain bothers him when he sits and stand [sic] and he can only lift 30 pounds.
> The undersigned has carefully evaluated the record and finds that the claimant's extreme medical non-compliance has significantly contributed to his symptoms. On February 2, 2007, Ms. Barnett noted that claimant had a history of non-compliance to treatment and was out of his medications for several months. Again, on February 22, 2007, Dr. Kornegay counseled the claimant regarding the importance of being compliant after he noted that the claimant was off his medications for two months. The claimant's non-compliance resulted in an emergency room visit on November 24, 2007. As a result, he suffered rubeotic glaucoma in the right eye and an altered mental status. He was diagnosed with loss of vision in the right eye and 20/70 in the left eye. Shortly thereafter, on December 1, 2007, the claimant returned to the emergency room because he ran out of his blood pressure medication and was not taking them. On December 28, 2007, he admitted to Ms. Kelly that he had not followed through with his blood pressure and diabetes treatments and had not been to the WATCH mobile for several months. The undersigned finds that the claimant [sic] symptoms could have been adequately controlled with medication and treatment. However, the claimant's extreme and continual non-compliance with his medications and treatments have significantly contributed to his symptoms.
> [Tr. 16-17].

Despite these findings, the ALJ concluded that Plaintiff was unable to return to his past relevant work as a janitor and industrial housekeeper because of the exertional and non-exertional requirements of those jobs. [Tr. 17]. However, the ALJ also indicated that Plaintiff had the ability to perform light work involving: 1) standing and walking six hours in an eight-hour workday; 2) sitting six hours in an eight-hour work day with alternating between sitting and standing every sixty minutes; 3) occasional climbing of stairs, crouching, balancing, stooping, bending, kneeling, and crawling; and 4) no climbing of ladders. [Tr. 17]. Plaintiff would also need to: 1) elevate his feet above his knee/waist for one hour during an eight-hour workday; and 2) avoid working around unprotected heights, dangerous moving machinery, operation of motor vehicles, and extreme cold. In addition, it was noted that Plaintiff could not use of firearms. [Tr. 17]. Furthermore, Plaintiff may experience mild to moderate pain that is amenable to control with medications without side effects. Finally, Plaintiff must also be limited to tasks that involve limited interaction with public, simple instructions, and simple, routine, repetitive tasks. [Tr. 13].

The VE testified that despite Plaintiff's restrictions, he could perform the following occupations 1) light/night housekeeper; 2) sorter; and 3) examiner/inspector/table worker. [Tr. 18]. All of these occupations only require light exertion. [Tr. 18].

Accordingly, the ALJ found that Plaintiff was capable of making a successful adjustment to other work that exists in significant numbers in the national economy and had

not been under a disability at any time through the date of his decision. [Tr. 18].

The undersigned shall now address Plaintiff's assignments of error.

## **Assignments of Error**

Plaintiff cites six assignments of error to the ALJ's decision. Specifically, Plaintiff argues that: 1) the ALJ did not give the proper weight to Plaintiff's treating physician's opinion; 2) the ALJ made "medical determinations beyond his capacity,"[2] 3) the ALJ "misapplie[d] the law of noncompliance"; 4) the ALJ's credibility determination was improper; 5) the ALJ's RFC determination was improper; and 6) the ALJ's decision is not supported by substantial evidence.

Plaintiff's first, second, fourth, and fifth assignments essentially contend that the ALJ improperly weighed and/or evaluated the evidence before him. However, this Court must uphold the Defendant's factual findings if they are supported by substantial evidence. The undersigned has already discussed in detail the evidence that the ALJ relied on in reaching his conclusions about the medical opinions in the record and his credibility determination. As a result, although Plaintiff may disagree with the ALJ's conclusions, the role of this Court is not to undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Secretary. Craig, 76 F.3d at 589. Therefore, the

---

[2] Plaintiff argues that the ALJ's decision was erroneous because the ALJ made "medical findings that more properly should have been made by a physician." [DE-16, p. 4]. However, Plaintiff does not identify which medical findings the ALJ made that he deems improper.

14

arguments in support of these assignments of error are without merit.  Likewise, Plaintiff's sixth assignment of error has already been addressed because the undersigned has concluded that the ALJ's decision is supported by substantial evidence.  Therefore, this argument is without merit as well.  The undersigned will now address Plaintiff's remaining assignment of error below.

**1.      Non-Compliance with Treatment**

Plaintiff asserts that the ALJ erred by concluding that his noncompliance with prescribed treatment weighed against his claim for disability.  **[DE-16, pgs. 3-7]**.  Specifically, Plaintiff argues that the ALJ should have further developed the record to obtain a consultative psychological examination to determine whether Plaintiff's alleged "lack of mental ability" prevented him from appreciating the severity of his illnesses and taking medical advice from his doctors.  **[DE-16, pgs. 4-7]**.  Plaintiff's argument is without merit.

The Fourth Circuit has recognized that the ALJ has "'a duty to explore all relevant facts and inquire into the issues necessary for adequate development of the record, and cannot rely only on the evidence submitted by the claimant when the evidence is inadequate.'" France v. Apfel, 87 F. Supp. 2d 484, 489 (D. Md. 2000) (quoting Cook v. Heckler, 783 F.2d 1168, 1173 (4th Cir. 1985)).  However, although the ALJ may contact various medical professionals to obtain additional information, there is no such requirement when "the record is adequate to make a determination regarding a disability claim." France,

15

[87 F. Supp. 2d at 489](87 F. Supp. 2d at 489).

In this case, the only evidence Plaintiff submitted in support of his mental deficiency claim, was testimony during the hearing that he took special education classes in middle school[3]. [Tr. 530, 533]. However, the evidence of record belies Plaintiff's argument regarding his alleged mental limitations. Specifically: 1) none of Plaintiff's treating or examining physicians noted any impairments in Plaintiff's ability to understand his illnesses, treatment, or medications specifically, or his ability to understand or take directions generally; 2) during an examination in 2007, Plaintiff readily admitted his consistent lack of compliance with treatment, but indicated that he was ready to stay with the program because he did not want to return to the hospital or suffer from organ failure; 3) in a statement, Plaintiff's stepfather indicated that Plaintiff was unimpaired in his ability to understand, concentrate, remember, follow instructions, pay attention, handle monetary matters, and complete tasks; and 4) when Plaintiff filed his applications for disability, he failed to cite any mental impairments in support of his claim. [Tr. 121-22, 142, 144, 210, 533].

In addition, when asked about his record of noncompliance during the hearing in this matter, Plaintiff did not cite any problems with comprehension regarding his treatment. Rather, he testified that he "just was frustrated and didn't feel like going to see nobody or nothing. . . ." [Tr. 538-39]. Thus, the ALJ was not required to obtain any additional

---

[3] Plaintiff attempted to submit school records proving that he had enrolled in these classes during the hearing, but decided that the records that were available would be unhelpful to the ALJ. [Tr. 530].

16

information to make a determination about Plaintiff's mental status.  France, 87 F. Supp. 2d at 489.  Therefore, Plaintiff's argument is without merit.

As a corollary to his argument regarding an alleged mental impairment, Plaintiff also suggests that his noncompliance with treatment was caused by lack of funds. **[DE-16, pgs. 4, 9]**.  While the evidence of record supports Plaintiff's claim that he had difficulty at times obtaining treatment because of a lack of resources, it also documents Plaintiff's willful failure to follow-up with low or no-cost treatment that was available to him.

For example, during a visit at the Wayne Memorial Hospital in February 2007, Plaintiff reported that even though he gets his insulin from WATCH[4], he had not used his insulin for approximately two months.  [Tr. 301, 349].  In addition, during a consultation in November 2007, Plaintiff admitted that he had not been compliant with his medications for a long time, and only intermittently followed up with WATCH. [Tr. 239].  A month later, in December 2007, Plaintiff indicated that he did not have the funds to pay for medication, but also related that he had a "good supply" of medication waiting for him at WATCH, but had not been there in several months. [Tr. 210].  Furthermore, during the hearing, Plaintiff testified that his failure to comply with his treatment was at times due to a lack of transportation, but also because he did not feel like going to get medical care and felt frustrated. [Tr. 539].

---

[4]WATCH Mobile Medical Unit is a free clinic in Goldsboro, North Carolina. [Tr. 530-31].  It has a Prescription Assistance Program (PAP) that provides medicine to low-income individuals. [DE-18, p. 7].

17

Thus, this evidence reveals that while Plaintiff may have experienced financial difficulty, which hindered his treatment, he also exacerbated his conditions by failing to avail himself of alternative low-costs treatment on numerous occasions. Therefore, Plaintiff's contention that the ALJ should not have considered his noncompliance as a factor that weighed against his disability claim is without merit.

## Conclusion

For the reasons discussed above, it is RECOMMENDED that Plaintiff's Motion for Judgment on the Pleadings **[DE-15]** be DENIED, the Defendant's Motion for Judgment on the Pleadings **[DE-17]** be GRANTED, and the final decision by the Defendant be AFFIRMED.

DONE AND ORDERED in Chambers at Raleigh, North Carolina this 27th day of May, 2009.

_____
William A. Webb
U.S. Magistrate Judge